UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
SHIRAZ R. SAID,                                    :
                                                   :
                              Plaintiff,           :
                                                   :       **OPINION AND ORDER**
        -against-                                  :       **14-CV-03514 (DLI)**
                                                   :
CAROLYN W. COLVIN,                                 :
Commissioner of Social Security,                   :
                                                   :
                              Defendant.           :
----------------------------------------------------------------x
**DORA L. IRIZARRY, Chief United States District Judge:**

On May 20, 2011, Plaintiff Shiraz R. Said ("Plaintiff") filed an application, *pro se*, for

Supplemental Security Income ("SSI") under the Social Security Act (the "Act"), alleging

disability beginning on July 29, 2009.[1] *See* Certified Administrative Record ("R."), Dkt. Entry

No. 23 at 15, 89-97. On November 2, 2011, her application was denied, and she timely requested

a hearing. *Id.* at 40-48. On December 10, 2012, Plaintiff appeared *pro se* and testified at a hearing

before Administrative Law Judge James Kearns (the "ALJ"). *Id.* at 25-39. By a decision dated

December 19, 2012, the ALJ concluded Plaintiff was not disabled within the meaning of the Act.

*Id.* at 15-21. On May 22, 2014, the Appeals Council denied review of the ALJ's decision, thereby

making the ALJ's decision the Commissioner's final decision. *Id.* at 1-6.

Plaintiff filed the instant appeal seeking judicial review of the denial of benefits, pursuant

to 42 U.S.C. § 405(g). *See* Complaint ("Compl."), Dkt. Entry No. 1. The Commissioner moved

for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure,

seeking affirmation of the denial of benefits. *See* Def. Mem. Plaintiff cross-moved for judgment

---

[1] Plaintiff was given an earlier protected filing date of April 29, 2011 by the Commissioner of Social Security
("Defendant"). *See* Mem. of Law in Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Mem."), Dkt. Entry No. 21.
Protected filing dates may reflect a claimant's inquiry about social security benefits with the Social Security agency
before a formal application has been filed. *See* 20 C.F.R. § 416.325(b)(2).

on the pleadings, seeking reversal of the Commissioner's decision and remand for further administrative proceedings. *See* Mem. of Law in Supp. of Pl.'s Cross Mot. ("Pl. Mem."), Dkt. Entry No. 19. For the reasons set forth below, the Plaintiff's cross-motion for judgment on the pleadings is granted and Commissioner's motion for judgment on the pleadings is denied.

## BACKGROUND[2]

### A.    Non-Medical Evidence and Self-Reported Evidence

Plaintiff was born in 1966. R. at 29. Plaintiff was 46 years old at the time of her hearing before the ALJ. *Id.* at 29. Her educational status is not listed in the Certified Administrative Record, but Plaintiff testified that she received her education in Palestine, Jerusalem. *Id.* at 27. Plaintiff could speak English, but could not read in English. *Id.* at 31. She had a driver's license, but had stopped driving three years before the hearing. *Id.* at 30-31. She never had held a job and primarily occupied her time with caring for her family. *Id.* at 31. Her family received food stamps. *Id.* at 30.

In a function report completed in conjunction with her application, Plaintiff indicated that she lived in a house with her husband and children. *Id.* at 125. She reported that, on an average day, she cared for her husband and children by preparing food, shopping for groceries, doing laundry, helping her children with school work, and sending her daughter to school in the morning. *Id.* at 126. She qualified that she prepared food daily, cleaned the house, and did laundry with the help of her children. *Id.* at 127-28, 135. She could pay bills and count change, but could not handle a savings account or handle money since her conditions began. *Id.* at 129. She did not

---

[2] Having thoroughly and carefully reviewed the administrative record, the Court finds the Commissioner's factual background accurately represents the relevant portions of said record. Accordingly, the following background is taken substantially from the background section of the Commissioner's brief, except as otherwise indicated.

have any difficulty with personal care, including dressing, bathing, grooming, shaving, feeding herself, and using the toilet. *Id.* at 126-27.

Plaintiff reported that she could follow spoken and written instructions. *Id.* at 132. She did not have problems with paying attention or with her memory. *Id.* at 132-33. She also did not have any problems getting along with people in authority. *Id.* at 132. As part of her daily activities, she sits in front of her house with her neighbor. *Id.* at 135. She went outside "almost every day" and was able to go out alone. *Id.* at 128. She reported visiting with friends and doctors a couple of times per week. *Id.* at 130. She reported having difficulty sleeping due to back pain. *Id.* at 126.

Additionally, Plaintiff reported that she could not lift anything heavy. *Id.* at 130. She maintained that she could not stand for long periods and could walk for ten minutes at a time, but would then need to take a five-minute rest. *Id.* at 130-32. She reported difficulty climbing stairs and kneeling and an inability to squat. *Id.* at 131. She reported pain in her back, neck, and legs, which radiated to her hand. *Id.* at 134. This pain occurred in the context of bending down and walking. *Id.* at 134. However, she reported no problem with sitting. *Id.* at 131. She also stated that she had no problems with using her hands. *Id.* at 131.

During her hearing before the ALJ, Plaintiff testified that she believed she was unable to work because she had problems with her back and legs and had diabetes. *Id.* at 32. Specifically, she noted having problems bending over since receiving knee surgery, and sleeping. *Id.* at 31-32. Plaintiff reported that she had undergone a successful knee replacement previously and bariatric surgery to reduce her weight. *Id.* at 32. Plaintiff claimed she needed a cane to walk and could only walk a single block at most. *Id.* at 36. She stated that she could lift only five pounds. *Id.* at 36. She reported using a special chair for prolonged sitting. *Id.* at 35.

During Plaintiff's hearing, ALJ called vocational expert ("VE") Pat Green and asked about a hypothetical individual who only could work at the light exertional level, do simple and repetitive tasks, and would need the option to sit or stand at will. *Id.* at 37. The VE testified that such an individual could work as a hand packager, and there are 365,000 such jobs in the national economy and 3,000 jobs regionally. *Id.* at 38. Such an individual could also work as an assembler of small products, and there are 230,000 such jobs in the national economy and 4,300 regionally. *Id.* at 38. Another potential occupation was garment sorter, with 135,000 positions in the national economy and 2,400 regionally. *Id.* at 38. The VE testified that if she needed one unscheduled absence per week, she would not be able to work in these positions. *Id.* at 38.

**B.      Relevant Medical Evidence**

Plaintiff saw internist Marina Perlova, M.D., at Lutheran Medical Center ("Lutheran") on July 10, 2008. *Id.* at 350. She reported pain in her lower back, neck, and left knee. *Id.* She had undergone a left shoulder arthroplasty in June 2007 and had no shoulder pain. *Id.* Upon examination, her neck was normal, she had a full range of motion in her lumbar and cervical spine, and she had a normal neurological exam. *Id.* at 350-51. Dr. Perlova diagnosed joint pain in the shoulder, lumber disc displacement, backache, non-specific skin erupt (rash), hyperlipidemia, and obesity. *Id.* at 351. Plaintiff was already taking Naproxen for pain, and Dr. Perlova prescribed Clotrimazole Cream for shoulder pain. *Id.* at 350-51.

Plaintiff saw Dr. Perlova again on July 28, 2008 and reported left knee pain. *Id.* at 348. Physical examination was normal, to the extent assessed, and no swelling or deformity was noted in the left knee, though there was painful extension of the knee. *Id.* at 348. She was medically cleared for arthroscopic knee surgery. *Id.* at 348-49.

On September 4, 2008, Plaintiff saw Dr. Perlova four weeks after surgery on her left knee. *Id.* at 346. Plaintiff sought a referral for physical therapy for her left knee. *Id.* Physical examination was normal. *Id.* at 346-47. Dr. Perlova recommended that Plaintiff receive twelve sessions of physical therapy. *Id.* at 347. Plaintiff saw Dr. Perlova on October 23, 2008 and reported continued left knee pain. *Id.* at 344. Physical examination was normal. *Id.* at 344. Dr. Perlova diagnosed osteoarthrosis in the left leg and dermatitis. *Id.* at 345.

On January 20, 2009, Plaintiff saw Dr. Perlova and reported that she had been seen in the emergency room on January 18, 2009 for lower back pain that was radiating to both legs, and she was prescribed Percocet. *Id.* at 338. Physical examination was normal, except for positive straight leg raising bilaterally at 30 degrees. *Id.* at 338-39. Dr. Perlova assessed Plaintiff with backache, sciatica, and Bell's palsy. *Id.* at 339. She also ordered a CT scan of the head and lumbar spine, and referred Plaintiff to neurosurgery due to severe lower back pain. *Id.* at 339. On the same day, Plaintiff underwent a CT scan of the lumbar spine. *Id.* at 163. At L4-L5, she had a broad based disc bulge causing mild bilateral neural foraminal narrowing. *Id.* at 163. At L5-S1, she had a right paracentral disc bulge and neural foraminal narrowing, with questionable contact with the exiting right-sided L5 spinal nerve. *Id.* at 163. On January 29, 2009, Plaintiff met with Dr. Perlova, who noted the results of the CT scan and prescribed Celebrex and Solaraze gel. *Id.* at 337. On February 24, 2009, Plaintiff saw Dr. Perlova and received a lumbosacral injection for low back pain. *Id.* at 334.

On March 26, 2009, Plaintiff met with Dr. Perlova and sought medical clearance for left knee surgery. *Id.* at 332. She reported left knee pain; she still had back pain and took Vicodin as needed. *Id.* at 332. Physical examination was normal overall, except for effusion in the right knee. *Id.* at 332.

On March 31, 2009, Steven Scalfani, M.D., an orthopedic surgeon, conducted a right knee arthroscopy, partial medial meniscectomy, and related procedures. *Id.* at 257. Plaintiff's pre and post-operative diagnosis was right knee synovitis and right knee medial meniscal tear. *Id.* at 257. Operative findings showed a grade four chondral lesion of the medial femoral condyle measuring 2 centimeter by 2 centimeter, a large synovial effusion, and inflamed medial pilca. *Id.* at 257. Plaintiff saw Dr. Scalfani on April 22, 2009 for follow up to her right knee arthroscopy. *Id.* at 230. Examination of the knee was normal and sensation was intact. *Id.* at 230. Physical therapy was recommended, and she was prescribed Vicodin for pain. *Id.* at 230.

Plaintiff returned to Dr. Perlova for follow up treatment on May 5, 2009, due to lower back pain radiating to both legs. *Id.* at 330. Physical examination was normal, except for positive straight leg raising bilaterally at 30 degrees. *Id.* at 330-31. She was prescribed Vicodin for pain. *Id.* at 330. Dr. Perlova assessed Plaintiff to have lumber disc displacement, backache, and obesity (Plaintiff's weight was at 215 pounds). *Id.* at 330-31. Plaintiff was referred for bariatric surgery due to obesity. *Id.* at 331.

On June 19, 2009, at Maimonides Medical Center ("Maimonides"), Plaintiff underwent a diskogram with fluoroscopic guidance at disks L4-L5 and L5-S1. *Id.* at 202-04. Neurological surgeon Amit Schwartz, M.D., recommended that Plaintiff have surgery but ordered the diskogram to confirm the disk level causing Plaintiff pain. *Id.* at 202. Upon examination, tenderness in the lower back was noted. *Id.* She was able to move all extremities and was ambulatory. *Id.* at 200. Straight leg raising was positive on the left side at 65 degrees, but otherwise negative. *Id.* at 202. She complained of lower back pain radiating down to her lower extremities, left more than right, with tingling. *Id.* Her diagnosis both before and after the procedure was chronic lower back pain,

lumber radiculopathy, and disk desiccation with moderate sized central disk protrusions posteriorly at the L5-S1 level. *Id.*

Plaintiff saw Dr. Scalfani on July 27, 2009 for follow up regarding her right knee. *Id.* at 229. She complained of pain and occasional giving way of the right knee. *Id.* at 229. Examination showed no effusion and tenderness over the medial joint line. *Id.* at 229. Flexion McMurray's test was mildly positive. *Id.* at 229. Her x-rays showed that the chondral lesion had significantly healed, although she was still showing signals in the posterior horn of the meniscus consistent with a complex tear. *Id.* at 229.

On July 29, 2009, at Maimonides, Plaintiff underwent an L5-S1 discectomy, instrumentation, and fusion with Dr. Schwartz. *Id.* at 164-65, 180-82.

On August 19, 2009, Plaintiff saw Dr. Perlova for follow up regarding her July 29, 2009 spinal surgery with Dr. Schwartz. *Id.* at 326. Abdominal excision and lower back incision were healing well. *Id.* at 326. She reported abdominal pain at the surgical site. *Id.* at 326. Plaintiff saw Dr. Perlova on September 15, 2009 for follow up and reported that she had less lower back pain and felt a little better. *Id.* at 325. Physical examination was normal, though back pain was noted. *Id.* at 325.

On October 27, 2009, Plaintiff underwent lumbar epidural steroid injections at L4, L5 and S1 with anesthesiologist Samy Lasheen, M.D., at Maimonides. *Id.* at 196-97. On physical examination, she had tenderness in the lower back area in the midline area and her range of motion of the lumbosacral spine was limited with extension with pain in the lower back. *Id.* at 196. However, her lower extremity examination showed no sensory or motor deficit. *Id.* Straight leg raising testing was negative. *Id.* She tolerated the injections "very well." *Id.* at 196-97. She had no hypertension or neurological deficits. *Id.* at 197.

Plaintiff saw Dr. Perlova on November 16, 2009 for follow up.  *Id.* at 323.  Physical examination was normal, though back pain was noted.  *Id.*  Dr. Perlova assessed Plaintiff to have lumber disc displacement, backache, and anemia.  *Id.* at 324.  She was referred to gastroenterology for treatment of anemia.  *Id.*

On January 19, 2010, Plaintiff saw Dr. Perlova for follow up and reported that she felt better and had less back pain.  *Id.* at 319.  Physical examination was normal.  *Id.*  She was referred to a nutritionist for hyperlipidemia.  *Id.* at 320.  She was referred to a neurologist for leg pain.  *Id.*

On February 22, 2010, Plaintiff saw neurologist Danielle Geraldi-Samara, M.D., at Maimonides and reported left lower extremity pain.  *Id.* at 157.  Dr. Geraldi-Samara reported that: (1) bilateral tibial and peroneal motor studies were normal, (2) bilateral sural sensory studies were normal, (3) bilateral tibial reflexes were absent, and (4) concentric needle EMG was normal.  *Id.* Based on these results, Dr. Geraldi-Samara stated that the study suggested, but was not diagnostic of, mild bilateral S1 radiculopathy.  *Id.*

Plaintiff returned to see Dr. Perlova on March 2, 2010 and again reported that she had less lower back pain.  *Id.* at 317.  Physical examination was normal.  *Id.*  Dr. Perlova assessed diabetes mellitus type II and hypertension.  *Id.* at 318.

On March 10, 2010, Plaintiff reported to family practitioner Mary Kennedy, M.D., at Lutheran that she had recently gained ten pounds and could not exercise due to back surgery and knee discomfort.  *Id.* at 315. Nutrition, diet, and meal planning were discussed.  *Id.* at 315-16. Magnetic Resonance Imaging ("MRI") of the lumbar spine performed on March 27, 2010 revealed status post lumbar fusion at L5-S1, with no indication of lumber disk herniation, spinal stenosis or foraminal stenosis at any lumber disk space level.  *Id.* at 161.  Mild facet hypertrophy was present at L4-L5.  *Id.*

Plaintiff saw Dr. Perlova for follow up on March 31, 2010 and reported severe lower back pain.  *Id.* at 312.  A review of Plaintiff's neurological system noted headache, paresthesia, tingling, numbness, lower back pain, and occasional difficulty with urination.  *Id.*  Physical examination was otherwise normal.  *Id.* at 312-13.

On April 13, 2010, Plaintiff underwent sacroiliac joint injections at L3, L4, L5 and S1 with Dr. Lasheen.  *Id.* at 190.  Upon physical examination, her results were almost identical to the previous findings from October 27, 2009.  *Id.* at 190, 196.  She complained of tenderness in the lower back area in the midline of the paravertebral muscles and her range of motion of the lumbosacral spine was limited especially with extension with pain in the lower back.  *Id.* at 190.  Her lower extremity examination showed no sensory or motor deficit.  *Id.* at 191.

On May 27, 2010, Plaintiff saw Dr. Perlova and complained of lower back pain upon standing up.  *Id.* at 309. Plaintiff reported that she had been advised by neurosurgery to use a walker in the morning.  *Id.* Review of systems and physical examination were normal.  *Id.* at 309-10.  An MRI of the pelvis was conducted to assess an ovarian cyst.  *Id.* at 310.  Plaintiff's hypertension was stable.  *Id.*  She was counseled to diet and exercise.  *Id.*

Plaintiff saw Dr. Perlova on September 21, 2010 for follow up and complained of thirst (polyuria).  *Id.* at 302.  Physical examination and review of systems was normal, except polyuria was noted.  *Id.* at 302-303.  Plaintiff was assessed with hyperlipidemia, hypertension, diabetes mellitus type II, and lumber disc displacement.  *Id.* at 303.

On October 28, 2010, Plaintiff saw Dr. Perlova and complained of left-sided pain with pressure radiating into an arm and hand numbness.  *Id.* at 299.  She reported that she had gone to the hospital and was told she had high blood pressure at 170/110.  *Id.* at 299.  Plaintiff also reported chest pain and was referred to cardiology for assessment.  *Id.* at 300.  Physical examination was

normal. *Id.* at 300. Blood sugar and pressure control were discussed, as was diet and exercise. *Id.* at 301.

On November 7, 2010, Plaintiff was admitted to Maimonides through the emergency room, with complaints of lower back pain. *Id.* at 205. Examination upon admission revealed that Plaintiff moved all extremities with equal strength and following all myotomal distribution. *Id.* Sensation was intact in all distributions. *Id.* She displayed normal range of motion in all joints and could ambulate without assistance. *Id.* at 209. An MRI showed a mild disk bulge at L3-4 and an annular disk bulge at L4-5. *Id.* at 222. She subsequently reported good pain relief. *Id.* at 211. The treatment notes recited that Plaintiff responded well to receiving pain meds and stated, "I feel the pain going away." *Id.* at 210.

A CT scan performed at Maimonides on November 8, 2010, at L5-S1, showed that her alignment was anatomical and no postsurgical complications were noted. *Id.* at 224. Her medications were adjusted. *Id.* at 205. Upon discharge on November 10, neurological examination revealed that she was oriented, moving all extremities with equal strength, and her sensory functioning was intact in all dermatomal distributions; however, Plaintiff complained of back pain and noted discomfort. *Id.* at 205-06. Plaintiff had equal deep tendon reflexes bilaterally and was ambulatory. *Id.* at 206.

Plaintiff saw Dr. Perlova on January 10, 2011 for follow up regarding lower back and right shoulder pain. *Id.* at 296. Plaintiff stated that she was seeing a pain management doctor and a cardiologist. *Id.* Physical exam and review of systems were normal. *Id.* at 296-97.

On January 14, 2011, Plaintiff underwent sacroiliac joint injections at L3, L4, L5 and S1 with anesthesiologist Dr. David Rosenblum, M.D. *Id.* at 185.

Plaintiff saw Dr. Perlova on February 17, 2011 with complaints of a headache and left-sided pain on her body over the past three weeks. *Id.* at 293. Plaintiff was referred to pulmonology due to morbid obesity (weight 230 pounds) and to be cleared for bariatric surgery. *Id.* at 294. On March 9, 2011, Plaintiff reported to Dr. Perlova neck pain that increased with movement. *Id.* at 290. Plaintiff reported being on a low fat, decreased diet, but had not lost weight (weight 231 pounds). *Id.* at 290. Review of systems and physical examination were normal. *Id.* at 290.

On March 16, 2011, Plaintiff saw Dr. Scalfani with respect to bilateral knee pain. *Id.* at 228. Dr. Scalfani reported crepitus range of motion (clicking and popping) of the right knee anteriorly, and tenderness to palpation on the medial joint line. *Id.* at 228. He noted severe joint deformity in the right knee and recommended physical therapy for strengthening. *Id.* at 228.

Plaintiff saw Dr. Perlova for follow up on April 5, 2011, and reported left-sided body aches and lack of weight loss (weight 233 pounds). *Id.* at 287-88. Review of Plaintiff's neurological systems was normal except for complaints of unspecified tingling and numbness and paresthesia. *Id.* at 287. Physical examination was normal, except obesity was noted. *Id.* at 288.

On April 27, 2011, orthopedic surgeon Salvatore J. Sclafani, M.D., noted that Plaintiff had an osteoarthritic condition in the right knee, which had not improved despite conservative treatment, physical therapy and NSAIDs. *Id.* at 227. Upon examination, she ambulated with an antalgic gait. *Id.* at 227. Dr. Sclafani recommended a right knee arthroplasty. *Id.* at 227.

On May 3, 2011, Plaintiff saw gastroenterologist Nidal Khoury, M.D., at Lutheran for a physical examination regarding planned bariatric surgery. *Id.* at 285. The gastroenterological examination was normal. *Id.* On May 27, 2011, Plaintiff met with Dr. Khoury again and was cleared for bariatric surgery. *Id.* at 277. She was assessed with gastroduodenitis, unspecified without mention of hemorrhage, and was prescribed Benefiber and Nexium. *Id.* at 277.

On May 5 and May 12, 2011, Plaintiff saw Dr. Perlova and reported knee pain, back pain, joint swelling and sciatica. *Id.* at 279, 282. Physical examination was otherwise normal. *Id.* at 280.

An esophagogastroduodenoscopy performed at Lutheran on May 9, 2011 revealed normal hypopharynx, esophagus, and duodenum. *Id.* at 354. There was mild non-erosive gastritis of the stomach. *Id.* at 354. Biopsies taken revealed gastric mucosa with mildly inactive chronic gastritis, no intestinal type metaplasia, and no dysplasia. *Id.* at 356. Testing for H. Pylori was negative. *Id.* at 356.

On May 31, 2011, Dr. Sclafani performed an elective total right knee replacement (arthroplasty), to address damage caused by osteoarthritic changes. *Id.* at 365-66, repeated at *Id.* at 542; *see Id.* at 359-445. In a follow up appointment on June 27, 2011, Plaintiff reported she was "significantly better." *Id.* at 548. Though the patient had erythema around the knee and started on antibiotics, her right knee's motion was "excellent" from extension to 130 degrees of flexion with good stability. *Id.* at 548. Dr. Sclafani wrote on July 27, 2011 that post-surgery Plaintiff had a nearly complete right knee range of motion. *Id.* at 545. On exam, her surgical incision was clean and dry and she was neurovascularly intact. *Id.* at 545. She had motion from extension to 130 degrees of flexion with good stability. *Id.* at 545. Dr. Sclafani concluded that Plaintiff was "doing well" status post right knee replacement. *Id.* at 545. Plaintiff reported she was "significantly better." *Id.* at 548. X-rays from a September 14, 2011 visit with Dr. Sclafini showed that Plaintiff's right shoulder and right knee were in satisfactory position and no fractures were evident. *Id.* at 544, 650. Plaintiff reported that, one week ago, she had fallen on her right knee and right shoulder. *Id.* at 544. Physical examination of her knee revealed a well-healed incision and no

abrasion. *Id.* Plaintiff had full motion of the knee and no instability. *Id.* Plaintiff's right shoulder had flexion to 160 degrees with pain, and internal rotation to L5. *Id.*

A September 28, 2011 lumbar x-ray showed that Plaintiff had mild degenerative changes at L3 to L4. *Id.* at 582. The vertebral body heights and alignment were well maintained. *Id.* An x-ray of Plaintiff's right knee was unremarkable. *Id.*

Internist Chitoor Govindaraj, M.D., conducted a consultative examination on September 28, 2011. *Id.* at 578-82. Plaintiff told Dr. Govindaraj that she did "a lot of walking." *Id.* at 579. Plaintiff's physical examination was normal, with a normal abdomen, spine, and extremities. *Id.* at 579-80. Her spine showed no kyphoscoliosis, gibbous, or tenderness. *Id.* at 580. Plaintiff's gait and posture were normal. *Id.* Her motor system, sensory system, and reflex findings were all normal. *Id.* Range of motion of her back and joints were within normal limits. *Id.* at 580. Her hand dexterity was normal. *Id.* There was no evidence of muscle spasm. *Id.* Straight leg raising was normal and range of motion was completely within normal limits. *Id.* Plaintiff did not need a cane for ambulation. *Id.* Dr. Govindaraj opined that Plaintiff was medically cleared with no restrictions in standing, walking, sitting or weight. *Id.* Dr. Govindaraj concluded that her overall medical prognosis was good. *Id.*

On March 19 and March 20, 2012, Plaintiff saw neurologist Idan Sharon, M.D., who performed electrodiagnostic studies regarding Plaintiff's upper and lower extremities. *Id.* at 598-607. Regarding Plaintiff's lower extremities, Dr. Sharon assessed severe chronic S1 radiculopathy bilaterally. *Id.* at 600. The studies also revealed myokymic discharge of bilateral lower extremities. *Id.* With respect to Plaintiff's upper extremities, Dr. Sharon assessed moderate chronic C7 radiculopathy on the right and left. *Id.* at 605. In a note dated November 20, 2012, Dr. Perlova stated that Plaintiff was unable to work due to lower back pain, severe osteoarthritis,

total knee replacement, diabetes, obesity and status post gastric band surgery. *Id.* at 611. No medical findings or specific limitations were described in this report. *Id.*

**C.    Evidence Submitted to the Appeals Council After the ALJ Rendered His Decision**

Plaintiff saw Dr. Scalfani on September 28 and October 19, 2011 after she reported that she slipped and fell in her kitchen and injured her right shoulder. *Id.* at 646, 649. There was no soft tissue swelling, but tenderness over the greater tuberosity. *Id.* at 646. Range of motion was limited to forward flexion to 100 degrees, abduction to 70 degrees, external rotation to 30 degrees and internal rotation to 25 degrees. *Id.* An MRI revealed a right rotator cuff tear. *Id.* at 646-47. Dr. Scalfani indicated that Plaintiff would be scheduled for surgery on her right shoulder. *Id.* at 646. On November 4, 2011, Plaintiff underwent arthroscopic right rotator cuff surgery at Lutheran. *Id.* at 642-44. The operative report by Dr. Scalfani assessed right shoulder rotator cuff tear, impingement, synovitis, and partial tear of the biceps. *Id.* at 642.

On November 7, 14, 2011 and 21, 2011, Plaintiff saw Dr. Scalfani following her recent right rotator cuff repair. *Id.* at 638, 639, 641. She had limited range of motion but was neurovascularly intact, and her sensation was intact. *Id.* at 638-39. X-rays were normal and there was no soft tissue swelling. *Id.* at 639.

A treatment note from Dr. Sclafani dated January 5, 2012 stated the Plaintiff reported feeling "significantly better, but still has pain." *Id.* at 637. On examination, her right knee incision site was well healed. *Id.* There was positive clicking at the anterior knee due to prosthesis. *Id.* There was good stability and sensation was intact. *Id.* In the right shoulder, she had forward flexion to 120 degrees, internal rotation less than buttock, abduction to 100 degrees. *Id.* There was weakness with external rotation and abduction. *Id.* X-rays of the right knee and right shoulder

showed satisfactory position and no abnormality. *Id.* Dr. Sclafani noted she had not been in therapy for her knee and advised her to engage in physical therapy. *Id.*

Plaintiff saw Dr. Scalfani on January 5 and February 28, 2012 following a right rotator cuff surgery. *Id.* at 636-37. In January, Plaintiff was in physical therapy for her shoulder and reported slight pain at 5/10. *Id.* at 636. She had mild weakness in the shoulder, but forward flexion to 165 degrees and internal rotation to L5. *Id.* at 636. Plaintiff reported clicking and pain in the right shoulder and knee. *Id.* at 637. Dr. Scalfani attributed the right knee clicking to the prosthesis. *Id.* at 637. In the right knee, he noted good stability. *Id.* With respect to the right shoulder, he noted weakness with external rotation and abduction. *Id.* She had forward flexion of the right shoulder to 120 degrees, and internal rotation less than to the buttock, and abduction to 100 degrees. *Id.*

On March 10, 2012, Plaintiff underwent an MRI of the lumbar spine. *Id.* at 632-33. At L4-L5, Plaintiff had a broad disc bulge with facet and ligamentous hypertrophy leading to mild bilateral foraminal stenosis, which was probably not significantly changed from prior assessments. *Id.* at 632. At L3-L4 there was a minimal disc bulge with right lateral disc protrusion and mild facet hypertrophy without significant central canal or foraminal stenosis or nerve root impingement. *Id.* at 632-33.

On June 11, 2012, Plaintiff saw Dr. Scalfani who noted that her lumbar surgical incision was well-healed. *Id.* at 631. Plaintiff had some tenderness over the lumbar area. *Id.* Plaintiff had some swelling in the left knee. *Id.* She had "crepitation of the patellofemoral joint and motion 0 to 135 degrees of flexion." *Id.* Left knee x-rays were negative for bone or joint abnormalities. *Id.* Surgical hardware from her lumbar spine fusion was noted to be in good position at L4- L5. *Id.* Dr. Scalfani recommended "conservative treatment" such as physical therapy and anti-inflammatory medications. *Id.*

A September 5, 2012 treatment note from Dr. Sclafani noted that on examination, Plaintiff's hip had good motion without pain. *Id.* at 630. Straight leg raise on the left was negative. *Id.* Examination of the knee revealed mild crepitus on range of motion with good stability and intact sensation. *Id.* The right knee incision site was well healed and she had good motion without pain. *Id.* Examination of the back revealed severe spasm of the paraspinal muscles. *Id.*

Plaintiff saw Dr. Scalfani for follow up on December 31, 2012. *Id.* at 622. She complained of right shoulder pain in connection with a November 2011 rotator cuff surgical repair. *Id.* Plaintiff stated her shoulder hurt after cleaning her bathroom and with overhead activities. *Id.* She denied any paresthesias to her right upper extremity. *Id.* Upon examination, no significant swelling was noted at her right shoulder. *Id.* Plaintiff had active ranges of motion in the right shoulder with forward flexion and abduction at 110 degrees, with tightness noted at extremes. *Id.* Passive range of motion of the right shoulder with forward flexion was 120 degrees and abduction to 170 degrees. *Id.* Her rotator cuff integrity was intact. *Id.* Plaintiff was neurovascularly intact in the right upper extremity. *Id.* X-rays of the shoulder taken that day were negative for fractures or lesions, and an ultrasound was negative for tears. *Id.*

On January 10, 2013, Dr. Perlova opined that Plaintiff was unable to work due to multiple medical conditions with attendant lower back pain, inability to sit or stand for prolonged periods, inability to bend down, and pain in both knees limiting ambulation. *Id.* at 615. Dr. Perlova noted that Plaintiff needed assistance with activities of daily living. *Id.*

On January 10, 2013, Plaintiff saw pain management specialist David Rosenbloom, M.D., at AABP Pain Medicine. *Id.* at 619. Physical examination revealed that Plaintiff was "healthy" and in no apparent distress. *Id.* Plaintiff had normal gait and stance. *Id.* Plaintiff's neck and head were normal, with full motor strength and range of motion. *Id.* Her thoracic spine was not swollen

or tender, and had a normal range of motion and normal posture. *Id.* Tenderness was noted in the sacral region. *Id.* Dr. Rosenbloom assessed lumbar radiculitis, failed back surgery syndrome, and myofascial pain syndrome. *Id.* He recommended a repeated sciatic nerve block and topical medications to treat myofascial pain. *Id.*

## DISCUSSION

### A.    Standard of Review

Unsuccessful claimants seeking disability benefits under the Act may appeal the Commissioner's decision by seeking judicial review and bringing an action in federal district court "within sixty days after the mailing . . . of notice of such decision or within such further time as the Commissioner of Social Security may allow." 42 U.S.C. § 405(g). In reviewing the final determination of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision. *See Zabala v. Astrue*, 595 F.3d 402, 408 (2d Cir. 2010); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). The former determination requires the court to ask whether "the claimant has had a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (internal citations omitted). The latter determination requires the court to ask whether the decision is supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)); *see Schaal*, 134 F.3d at 501. If the district court finds that there is substantial evidence supporting both the claimant's and Commissioner's position, it must rule for the Commissioner, as that position is based on the factfinder's determination. *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990) (internal citations omitted); *see also DeChirico v. Callahan*, 134

F.3d 1177, 1182 (2d Cir. 1998) (affirming Commissioner's decision where substantial evidence supported either side).

The district court is empowered "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  A remand by the court for further proceedings is appropriate when "the Commissioner has failed to provide a full and fair hearing, to make explicit findings, or to have correctly applied the . . . regulations." *Manago v. Barnhart*, 321 F. Supp. 2d 559, 568 (E.D.N.Y. 2004) (internal citations omitted).  A remand to the Commissioner also is appropriate "[w]here there are gaps in the administrative record." *Rosa v. Callahan*, 168 F.3d 72, 83 (2d Cir. 1999) (quoting *Sobolewski v. Apfel*, 985 F. Supp. 300, 314 (E.D.N.Y. 1997)).  Unlike judges in trial, ALJs have a duty to "affirmatively develop the record in light of the essentially non-adversarial nature of the benefits proceedings." *Tejada v. Apfel*, 167 F.3d 770, 774 (2d Cir. 1999) (quotations omitted).

## B.     Disability Claims

To receive disability benefits, claimants must be disabled within the meaning of the Act. *See* 42 U.S.C. §§ 423(a), (d).  Claimants establish disability status by demonstrating an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  Further, the claimant's impairment must have been of such severity that she is unable to do her previous work or, considering her age, education, and work experience, she could not have engaged in any other kind of substantial gainful work that exists in the national economy.  42 U.S.C. § 1382c(a)(3)(B).  The claimant bears the initial burden of proving disability status by presenting "medical signs and

findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment that results from anatomical, physiological, or psychological abnormalities which could reasonably be expected to produce the pain or other symptoms alleged" and which leads to the conclusion that the individual has a disability. 42 U.S.C. §§ 423(d)(5)(A), 1382c(a)(3)(A), (D); *see also Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983).

ALJs must adhere to a five-step inquiry to determine whether a claimant is disabled under the Social Security Act, as set forth in 20 C.F.R. §§ 404.1520 and 416.920. The inquiry ends at the earliest step at which the ALJ determines that the claimant is either disabled or not disabled. First, the claimant is not disabled if she is working and performing "substantial gainful activity." 20 C.F.R. §§ 404.1520(b), 416.920(b). Second, the ALJ considers whether the claimant has a "severe impairment," without reference to age, education, and work experience. Impairments are "severe" if they significantly limit a claimant's physical or mental ability to conduct basic work activities. If the claimant does not have a severe impairment, she is not disabled. 20 C.F.R. §§ 404.1520(c), 416.920(c). Third, the ALJ will find the claimant disabled if her impairment meets or equals an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant does not have a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity ("RFC") in steps four and five. 20 C.F.R. §§ 404.1520(e), 416.920(e). At the fourth step, the claimant is not disabled if she possesses the RFC to perform past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). RFC is defined in the applicable regulations as "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). To determine RFC, the ALJ makes a "function by function assessment of the

claimant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch . . . ."
*Sobolewski v. Apfel*, 985 F. Supp. 300, 309 (E.D.N.Y. 1997). The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work and may be categorized as sedentary, light, medium, heavy, or very heavy. 20 C.F.R. § 404.1567.

Finally, at the fifth step, the ALJ considers factors such as age, education, and work experience alongside her RFC to determine whether the claimant could adjust to other work that exists in the national economy. If the claimant could make such an adjustment, she is not disabled. 20 C.F.R. §§ 404.1520(g), 416.920(g). At this final step, the burden shifts to the Commissioner to demonstrate that the claimant could perform other work. *See Draegert v. Barnhart*, 311 F.3d 468, 472 (2d Cir. 2002) (citing *Carroll,* 705 F.2d at 642).

## C.      The ALJ's Decision

On December 19, 2012, the ALJ issued a decision denying Plaintiff's claims and concluding that Plaintiff was not disabled within the meaning of the Act. R. at 15. The ALJ followed the five-step inquiry in making his determination. R. at 15-17. At the first step, he determined that Plaintiff had performed no substantial gainful activity since the application date of April 29, 2011. R. at 17. At the second step, the ALJ found that Plaintiff had severe impairments with diabetes, obesity, and back and knee disorders. R. at 17. At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the criteria of any listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 17. Accordingly, the ALJ proceeded to steps four and five. The ALJ determined that Plaintiff retained the RFC to perform light work, but only that requiring simple and repetitive tasks with the option to sit or stand at will. R. at 17-20. Finally, the ALJ determined that considering the claimant's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the

national economy that she can perform, such as Hand Packager, Small Products Assembler, and Garment Sorter. R. at 21. Thus, the ALJ concluded Plaintiff was not disabled. R. at 15, 21. The ALJ's decision became the Commissioner's final decision when the Appeals Council denied Plaintiff's request for review. R. at 1-6.

**D.      Analysis**

The Commissioner moves for judgment on the pleadings, seeking affirmance of the denial of Plaintiff's SSI benefits on the grounds that the ALJ applied the correct legal standards to determine that Plaintiff was not disabled and that the factual findings are supported by substantial evidence. *See generally* Def. Mem.; Reply Mem. of Law in Further Supp. of Def.'s Mot. for J. on the Pleadings ("Def. Reply Mem."), Dkt. Entry No. 22. Plaintiff cross-moves for judgment on the pleadings, contending that the ALJ failed to properly (1) apply the treating physician rule in evaluating the opinion of Dr. Perlova and (2) evaluate Plaintiff's credibility. *See generally* Pl. Mem. Plaintiff seeks reversal of the ALJ decision and remand. *See Id.* at 25-26.

Upon review of the record, the Court finds that the ALJ did not apply the correct legal standards as to the treating physician rule and Plaintiff's credibility.

**1.      Unchallenged Findings**

The ALJ's findings as to steps one, two, and three are unchallenged. *See generally Id.* Upon a review of the record, the Court concludes that the ALJ's findings at steps one through three are supported by substantial evidence.

**2.      Application of Treating Physician Rule to the Opinion Dr. Perlova**

Plaintiff contends that, under the treating physician rule, the ALJ failed to assess Dr. Perlova's opinion properly. Pl. Mem. at 13-21. In particular, Plaintiff alleges that the ALJ did not evaluate the frequency of examination and the length, nature, and extent of the treatment

relationship with Dr. Perlova, whose report was "well substantiated and consistent with the record as a whole." *Id.* The Court agrees with Plaintiff's assertions that the ALJ incorrectly discredited the opinion of Dr. Perlova.

An ALJ must give controlling weight to the opinion of a treating physician with respect to "the nature and severity of [a claimant's] impairment(s)." 20 C.F.R. § 416.927(c)(2); *see also Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (*per curiam*); *Shaw v. Chater*, 221 F. 3d 126, 134 (2d Cir. 2000). A claimant's treating physician is one "who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient relationship with the individual." *Schisler v. Bowen*, 851 F.2d 43, 46 (2d Cir. 1988). A treating physician's medical opinion regarding the nature and severity of a claimant's impairment is given controlling weight when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with other substantial evidence in the record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (quotation marks and alteration omitted).

However, "[w]hile the opinions of a treating physician deserve special respect . . . they need not be given controlling weight where they are contradicted by other substantial evidence in the record," *Lazore v. Astrue*, 443 F. App'x 650, 652 (2d Cir. 2011) (quoting *Veino v. Barnhart*, 312 F. 3d 578, 588 (2d Cir. 2002)), such as the opinions of other medical experts. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). Where a treating source's opinion is not given controlling weight, the ALJ must assess several factors to determine the proper weight accorded, including: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; and (iv) whether the opinion is from a specialist." *Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998); *see also* 20 C.F.R. § 416.927(c)(2)-(6). Some findings,

including the ultimate finding of whether a claimant is disabled and cannot work, are reserved to the Commissioner and, therefore, are never given controlling weight. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (internal quotation marks omitted). Nevertheless, the ALJ must "comprehensively set forth his reasons for the weight assigned to a treating physician's opinion." *Greek*, 802 F.3d at 375 (quotation marks and alteration omitted). A failure to provide "good reasons" for "not crediting the opinion of the claimant's treating physician is a ground for remand." *Id.* (quotation marks omitted). At no point is the ALJ permitted "to substitute his own expertise or view of the medical proof for the treating physician's opinion or for any competent medical opinion." *Id.*

Here, the ALJ determined that Dr. Perlova's opinion was not consistent with the medical evidence. R. at 20. Specifically, the ALJ found that Dr. Perlova failed "to substantiate her findings with objective evidence, diagnostic reports or other clinical findings" and "her only support for her assessment of disability is a list of the claimant's medication, hardly enough evidence on which to render a finding of disability." *Id.* The ALJ did not assess the evaluative factors required for assigning the proper weight to be given to Dr. Perlova's opinion. Instead, the ALJ made only the conclusory assertion that Dr. Perlova failed to substantiate her findings. The ALJ did not properly apply the treating physician rule because he did not provide further explanation. This legal error requires remand.

First, if an ALJ believes that a treating physician's opinion lacks support or is inconsistent, the ALJ may not discredit that opinion without affirmatively seeking out clarifying information from the treating physician. *See Clark*, 143 F.3d at 118 (finding that an ALJ's duty to develop the administrative record and seek additional information exists independently from claimant's obligation to present evidence on his or her own behalf); *Jeffcoat v. Astrue*, 2010 WL 3154344,

*12 (E.D.N.Y. 2010) ("Because of this deferential standard, if an ALJ believes that a treating physician's opinion lacks support or is internally inconsistent, he may not discredit the opinion on this basis but must affirmatively seek out clarifying information from the doctor."); *Calzada v. Astrue*, 753 F. Supp.2d 250, 269 (S.D.N.Y. 2010) ("[I]f a physician's finding in a report is believed to be insufficiently explained, lacking in support, or consistent with the physician's other reports, the ALJ must seek clarification and additional information from the physician to fill any clear gaps before dismissing the doctor's opinion."). The ALJ should have sought further clarification from Dr. Perlova rather than simply rejecting her opinion on the ground that she did not substantiate her findings with "objective evidence, diagnostic reports or other clinical findings."

Additionally, the ALJ's hasty rejection of Dr. Perlova's opinion is unfounded because the record contains voluminous records of Plaintiff's visits with Dr. Perlova. These records are not wholly inconsistent with Dr. Perlova's opinion that Plaintiff is unable to work due to "lower back pain, severe osteroarthritis, total knee replacement, diabetes, obesity and status post gastric band surgery." R. at 20. The ALJ failed to review these records, and the records from other medical doctors, to evaluate whether there is proper evidence in support of the treating physician's opinion and whether Dr. Perlova's opinion is consistent with the record as a whole. The ALJ also should have recognized that, in connection with the "frequency of examination and the length, nature, and extent of the treatment relationship," Dr. Perlova has treated Plaintiff since 2008, regularly monitoring and diagnosing Plaintiff's conditions, prescribing medication, and referring her for tests, specialist treatments, and surgeries. From 2008 through 2011, Plaintiff met with Dr. Perlova nearly two dozen times about her ongoing back and knee problems and obesity, and Dr. Perlova chronicled Plaintiff's responsiveness to various treatments and pain management. Notably, Plaintiff continued to see Dr. Perlova for ongoing shoulder and knee problems after the ALJ had

rendered his decision.

Second, the ALJ erred by adopting the opinion of the physical consultative examiner, Dr. Govindaraj. Where a consulting physician's opinion is more consistent with the record as a whole, the opinion may be given more weight than the treating physician's opinion. *See Padro v. Astrue*, 2012 WL 3043166, at *6 (E.D.N.Y. July 25, 2012); *Oliphant v. Astrue*, 2012 WL 3541820, at *19 (E.D.N.Y. Aug. 14, 2012) ("The Second Circuit has held that if the record supports a consultative, non-examining medical opinion, the ALJ may accord that opinion greater weight than the opinion of a treating physician."). However, the ALJ still must provide "good reasons" for giving more weight to a consulting physician's opinion based on the factors set forth in 20 C.F.R. § 416.927(c)(2)-(6). *Padro*, 2012 WL 3043166, at *6. Here, the ALJ did not provide sufficient explanation and only broadly concluded that Dr. Govindaraj's opinion was "substantiated by objective evidence, clinical findings and the claimant's statements in the records." R. at 20. Dr. Govindaraj only examined Plaintiff on one occasion, and the record does not contain any diagnostic evidence to support the ALJ's finding. At best, the highlights of Dr. Govindaraj's report include notes on "total knee replacement," lack of kyphoscoliosis, gibbous, or tenderness with Plaintiff's spine, "range of motion within normal limits," Plaintiff's not needing a cane for ambulation, and Plaintiff "does a lot of walking." R. at 579-80. However, there is insufficient evidence of the extent to which Plaintiff can walk, stand, or sit or whether Plaintiff needs assistance with daily activities, for example. The report provides little helpful information for determining Plaintiff's ability to work as compared to Dr. Perlova's extensive records.

The ALJ failed to apply properly the treating physician rule. Upon remand, the ALJ is directed to evaluate the opinion of Dr. Perlova against the evaluative factors, along with the tests, consultation logs, and observation notes provided by Dr. Perlova, and to seek clarifying

information from Dr. Perlova, if necessary, to determine whether Plaintiff is disabled under the Act.

### 3. Plaintiff's Credibility

Plaintiff also contends that the ALJ erred in discrediting her statements regarding the severity of her symptoms in assessing her functional capacity. Pl. Mem. at 21-23. The Court agrees.

The Second Circuit recognizes that subjective allegations of pain may serve as a basis for establishing disability. *See Taylor v. Barnhart,* 83 F. App'x 347, 350 (2d Cir. 2003). However, the ALJ is afforded discretion to assess the credibility of a claimant and is not "required to credit [plaintiff's] testimony about the severity of her pain and the functional limitations it caused." *Correale-Englehart v. Astrue,* 687 F. Supp.2d 396, 434 (S.D.N.Y. 2010) (quoting *Rivers v. Astrue,* 280 F. App'x 20, 22 (2d Cir. 2008)). To determine Plaintiff's credibility, the ALJ must adhere to a two-step inquiry set forth by the regulations. *See Peck v. Astrue,* 2010 WL 3125950, at *4 (E.D.N.Y. Aug. 6, 2010). First, the ALJ must consider whether there is a medically determinable impairment that reasonably could be expected to produce the pain or symptoms alleged. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (*per curiam*); 20 C.F.R. §§ 404.1529(b), 416.929(b); *see* SSR 16-3p. At the first step, Plaintiff's allegations "need not be substantiated by medical evidence, but simply consistent with it" because the "entire purpose" of § 416.929 is "to provide a means for claimants to offer proof that is not wholly demonstrable by medical evidence." *McClinton v. Colvin*, 2015 WL 6117633, at *31 (S.D.N.Y. Oct. 16, 2015) (citation omitted). Second, if the ALJ finds that the individual suffers from a medically determinable impairment that reasonably could be expected to produce the pain or symptoms alleged, then the ALJ is to evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which

they limit the individual's capacity for work. 20 C.F.R. §§ 404.1529(c), 416.929(c); *see* SSR 16-3p.

If Plaintiff's testimony concerning the intensity, persistence, or functional limitations associated with her impairments is not fully supported by objective medical evidence, the ALJ must evaluate the claimant's credibility in light of seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain; (5) any treatment, other than medication, that the claimant has received; (6) any other measures that the claimant employs to relieve the pain; and (7) other factors concerning the claimant's functional limitations and restrictions as a result of the pain. 20 C.F.R. §§ 404.1529(c)(3)(i)-(vii), 416.929(c)(2)(i)-(vii); *Meadors v. Astrue*, 370 F. App'x 179, 183-84 (2d Cir. 2010) (Summary Order).

"If the ALJ rejects plaintiff's testimony after considering the objective medical evidence and any other factors deemed relevant, he must explain that decision with sufficient specificity to permit a reviewing court to decide whether there are legitimate reasons for the ALJ's disbelief." *Correale-Englehart*, 687 F. Supp.2d at 435. When the ALJ neglects to discuss at length his credibility determination with sufficient detail to permit the reviewing court to determine whether there are legitimate reasons for the ALJ's disbelief and whether his decision is supported by substantial evidence, remand is appropriate. *Id.* at 435-36; *see also Jaeckel v. Colvin*, 2015 WL 5316335, at *9-11 (E.D.N.Y. Sept. 11, 2015) (remanding where "the ALJ failed to consider all the factors . . . and explain how he balanced those factors"); *Valet v. Astrue*, 2012 WL 194970, at *22 (E.D.N.Y. Jan. 23, 2012) (remanding where the ALJ "considered some, but not all of the mandatory" factors); *Grosse v. Comm'r of Soc. Sec.,* 2011 WL 128565, at *5 (E.D.N.Y. Jan. 14,

2011) (finding that the ALJ committed legal error by failing to apply factors two through seven).

In the instant action, the ALJ did not perform properly the two-step inquiry. The ALJ did not answer the threshold question of whether there was a medically determinable impairment that reasonably could be expected to produce the alleged pain or symptoms. Instead, the ALJ summarily concluded that, because the severity of Plaintiff's symptoms "do not fully prevent her from performing her activities of daily living," and, because there were conflicting statements about Plaintiff's ability to read or write English, Plaintiff therefore is not credible. R. at 19. It is unclear to the Court whether the ALJ found that: (1) the Plaintiff's alleged pain reasonably is not consistent with the medical conditions from which she suffers; or (2) that the alleged pain is consistent with Plaintiff's medical conditions, but the intensity and persistence of the alleged pain are unsubstantiated, making her subjective allegations not credible. This is legal error requiring remand. *See Meadors v. Astrue*, 370 F. App'x at 185 (remanding because the ALJ did not expressly consider the two-step inquiry and improperly "subjected [claimant's] pain contentions to a credibility analysis at the outset"); *Emsak v. Colvin*, 2015 WL 4924904, at *16 (E.D.N.Y. Aug. 18, 2015).

Moreover, in ALJ's brief analysis of Plaintiff's credibility, he did not conduct properly the multi-factor analysis in reviewing Plaintiff's testimony concerning the intensity, persistence, or functional limitations associated with her impairments. The ALJ did not explain which relevant factors were considered in making a credibility determination, which of Plaintiff's statements he found not credible (other than in the ability to speak or write English), or how he balanced any of the required factors. This, too, is legal error requiring remand.

While it is clear from the record that the ALJ considered Plaintiff's daily activities from her Adult Function Report, *see* R. at 19, the ALJ failed to address any of the other factors. An

ALJ must "consider each of the factors set forth in § 404.1529(c)(3)" and "cannot simply selectively choose evidence in the record that supports his conclusion" or "mis-characterize a claimant's testimony or afford inordinate weight to a single factor, because a claimant need not be an invalid to be found disabled under the Social Security Act." *Meadors*, 370 F. App'x at 185, n. 2 (citation omitted); *see also Jaeckel*, 2015 WL 5316335, at *10-11; *Pereyra v. Astrue*, 2012 WL 3746200, at *15 (E.D.N.Y. Aug. 28, 2012); *Cabassa v. Astrue*, 2012 WL 2202951, at *14 (E.D.N.Y. June 13, 2012); *but see Cichocki v. Astrue*, 534 F. Appx 71, 76 (2d Cir. 2013) (Summary Order) ("While the ALJ did not discuss all seven factors listed in 20 C.F.R. § 416.929(c)(3), he provided specific reasons for his credibility determination . . . . Because the ALJ thoroughly explained his credibility determination and the record evidence permits us to glean the rationale of the ALJ's decision, the ALJ's failure to discuss those factors not relevant to his credibility determination does not require remand") (citation omitted).

Here, the ALJ did "not analyze those factors or incorporate them into his analysis" and did not "indicate how he balanced the various factors." *Baez v. Colvin*, 2015 WL 2356729, at *16 (E.D.N.Y. May 14, 2015) (citing *Simone v. Astrue*, 2009 WL 2992305, at *11 (E.D.N.Y. Sept. 16, 2009) (remanding where the ALJ "did not offer any analysis of the factors prescribed for evaluating subjective pain")). Because the ALJ failed to consider the other relevant factors and afforded disproportionate weight to Plaintiff's daily activities only, remand is appropriate for these reasons as well.

Lastly, the Court agrees with Plaintiff that the ALJ mischaracterized Plaintiff's testimony. ALJ concluded that Plaintiff "could do a little walking," "had no problem sitting," "could perform grocery shopping, housework and . . . sit in front of her house with her neighbor," and "clean her house and do her laundry." R. at 19. The ALJ further noted that "she went outside almost every

day and she drove." R. at 19. Therefore, "the severity of her impairments do not fully prevent her from performing her activities of daily living." R. at 19.

While the ALJ was not wholly incorrect in summarizing Plaintiff's testimony, the ALJ failed to acknowledge Plaintiff's qualified explanations. For instance, Plaintiff qualified her descriptions in the Adult Function Report by stating that: (1) her sons helped her clean the house and do laundry; (2) she could only shop for groceries "twice a week for an hour each time;" (3) going outside meant going to her neighbor's home; and (4) she sometimes needed others' help to complete tasks. R. at 126-32. She stated she was unable to stand "for long periods of time," climb stairs, kneel, squat, or reach for things on the floor. R. at 131. Additionally, Plaintiff testified during the hearing that she could only walk for ten minutes and then needed to rest for five minutes due to pain in her back, necks, and legs. R. at 134. Plaintiff further testified that the pain from her legs caused her to "cry like a baby" and "[e]verybody help me, everybody, my husband help me, my kids help me . . ." with tasks. R. at 33-34. She testified that: (1) she could only walk for a "block, not more;" (2) she needed to use a cane due to surgeries on her knee and shoulder; (3) she needed a "special chair" to help her sit down because of her back and leg problems; and (4) she had problems standing. R. at 33-34. Plaintiff also specifically noted that, while she had a driver's license, she had stopped driving three years before. R. at 31.

On remand, the ALJ should make an express finding as to whether Plaintiff's medical conditions reasonably could be expected to produce the alleged pain. If so, he next must evaluate the intensity, persistence, and functional limitations, and, to the extent that Plaintiff's alleged pain exceeds that which might reasonably flow from her medical conditions, the ALJ then should proceed to undertake a credibility analysis pursuant to the factors listed in § 404.1529(c)(3).

## <u>CONCLUSION</u>

For the foregoing reasons, the Defendant's motion for judgment on the pleadings is denied

and Plaintiff's cross-motion for judgment on the pleadings is granted to the extent that this matter

is remanded pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings

consistent with this opinion.

SO ORDERED.

Dated: Brooklyn, New York
          September 30, 2016

                                                    _____
                                                              /s/
                                                    DORA L. IRIZARRY
                                                    Chief Judge